# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| KEESA WARRIOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-956-CV-W-NKL-SSA |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Keesa Warrior ("Plaintiff") challenges the Social Security Commissioner's ("Commissioner") denial of her claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 401, *et seq.* On May 16, 2006, an Administrative Law Judge ("ALJ") found that Plaintiff was not disabled. The decision of the ALJ stands as the final decision of the Commissioner. Plaintiff seeks judicial review, petitioning for reversal of the ALJ's decision and an award of benefits. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Because the Court finds that the ALJ's decision is not supported by substantial evidence in the record as a whole, the Court granted Plaintiff's petition.

1

## I. Factual Background[1]

Plaintiff alleged disability commencing September 1, 2001, due to asthma, an ovarian cyst, and ankle and leg swelling. Plaintiff was born in 1982. She has a tenth-grade education and has worked in the past as a line server and cashier in the food service industry.

### A. Medical Records

In January 2002, Warrior presented to Truman Medical Center ("TMC") with complaints of epigastric pain, fatigue, insomnia, and headaches. She reported she smoked one-half package of cigarettes per day. Other than abdominal tenderness in the mid-epigastric area, a physical examination was normal. Her lungs were clear and she had no joint deformity, clubbing, or edema.

In July 2002, Warrior presented to Karla L. Houston-Gray, M.D., with complaints of pain and swelling in her ankle for the past ten months. Warrior reported weakness, fatigue, fevers, chills, night sweats, sinus problems, frequent sore throat, shortness of breath, leg pain with walking, leg cramps, nausea, vomiting, diarrhea, constipation, and arthritic pain. A physical examination was normal. Warrior's lungs were clear; she had no edema in her extremities and x-rays of her ankles revealed no evidence of bone injury or disease. Four days later, Warrior underwent sonography, which revealed no evidence of deep vein thrombosis in her legs.

---

[1] Portions of the parties' briefs are adopted without quotation designated.

In August 2002, Warrior complained of right leg pain, which began after she became pregnant. She also complained of right foot numbness and "some" swelling, but she had no other complaints. On examination, Warrior's lungs were clear. She had trace to "+1" edema in the right leg. Five days later, x-rays of Warrior's right ankle and knee revealed no evidence of bone injury or disease.

In October 2002, Warrior presented for follow-up with her leg. She also reported experiencing headaches, blurred vision, and "occasional" stomachaches. A physical examination revealed tender sinuses, but was otherwise normal. Warrior's lungs were clear, and she had no edema in her extremities.

In April 2003, Warrior presented to Dr. Houston-Gray with complaints of increased heart beat. Warrior reported that she smoked, and Dr. Houston-Gray had a "long discussion" with Warrior regarding the importance of smoking cessation. A physical examination was normal. Warrior's lungs were clear and she had no edema in her extremities.

In August 2003, Warrior presented to the emergency room with an asthma attack. A physical examination revealed wheezing. Warrior had normal range of motion in her extremities and no edema. Warrior was encouraged to stop smoking and released in "improved" condition. She returned to the emergency room the next day with complaints of dyspnea, wheezing, and chest tightness. A physical examination revealed wheezing. The treatment provider assessed acute exacerbation of asthma and acute bronchitis. Warrior was released in "improved" and "stable" condition. Chest x-rays taken the following day revealed clear lungs with no evidence of pathology. On the same day, a computed tomography ("CT")

scan of Warrior's chest revealed "some patchy and peripheral airspace disease in the left upper lobe."

In March 2004, Warrior complained of feeling tired for the previous week. A physical examination was normal. Warrior's lungs were clear and she had no edema in her extremities.

From May 31, 2004, through June 3, 2004, Warrior was hospitalized with an exacerbation of asthma. Upon admission, Warrior had decreased air movement and wheezing. Her extremities were non-tender with a normal range of motion. A chest x-ray was normal and revealed clear lungs. Warrior was noted to walk "frequently" with no limitation in mobility. During her hospitalization, Warrior was treated with aggressive pulmonary toiletry, aerosol breathing treatments, and intravenous steroids. The treating physician noted that Warrior's hospital course was "uneventful" and her symptoms "improved." Warrior reported that she continued to smoke one-half package of cigarettes per day, and Dr. Houston-Gray noted that Warrior was to be "seen by the tobacco dependency people." Upon discharge, Warrior was prescribed medication, and her diagnoses included asthma exacerbation, pregnancy, and bronchitis. She was discharged in stable condition.

In July 2004, Warrior presented to the emergency room with an exacerbation of asthma. A physical examination revealed wheezing and crackling. Her extremities were non-tender with a normal range of motion and no edema. A chest CT scan revealed no pleural effusion and no evidence of pulmonary emboli. A chest x-ray revealed no acute radiographic abnormality.

In September 2004, Warrior presented to Dr. Houston-Gray with complaints of "some" leg pain and swelling since leaving the hospital. Warrior reported a history of fibromyalgia, and stated that her pain was primarily in her calf area. On examination, Warrior's lungs were clear. Dr. Houston-Gray prescribed a muscle relaxant for Warrior's leg pain and swelling. One week later, Warrior underwent bilateral lower extremity venous Doppler, which revealed no evidence of deep vein thrombosis in the right or left leg.

In December 2004, Warrior presented to Dr. Houston-Gray after she began experiencing an asthma attack. On examination, Warrior had "some" wheezing. She was given breathing treatment and instructed to follow-up as needed.

In September 2005, Warrior underwent a sleep study. The study revealed hypersomnia, but no obstructive sleep apnea-hypopnea syndrome.

No medical opinions concerning Plaintiff's ability to function in the workplace or work-related abilities appear in the record.

**B.     Testimony**

The ALJ held an administrative hearing in April 2006 at which Plaintiff testified. She discussed her past work, including work in 1999 as a waitress and a cook, which involved lifting boxes weighing twenty to thirty pounds.

Plaintiff discussed her breathing issues. She testified that she could walk for fifteen to twenty minutes before she would get tightness in her chest. Plaintiff said that temperatures under about forty or fifty degrees, and over about seventy-five degrees, caused tightness in her chest and coughing, as did wind and humidity. She said she used her inhaler about five

5

times per day, and would need to lie down for about an hour afterward waiting for the medication to become effective. She would use a nebulizer to address asthma attacks, which occurred once or twice per month. Plaintiff testified she continued to smoke about five cigarettes per day. Plaintiff testified that Dr. Houston-Gray diagnosed her with borderline lupus, and that St. Joe Hospital diagnosed her with fibromyalgia, though she was not treated for either condition.

She stated that she could only stand for about fifteen minutes before her ankles began to swell, and that she had to keep her feet elevated. She said that Dr. Gray had performed tests but did not tell Plaintiff why the swelling occurred, but recommended that Plaintiff prop up her feet.

Plaintiff testified regarding mental health issues. She stated that she first saw a mental health professional in about 2002. She said that she had been diagnosed with psychotic depression at Swope Parkway Health Center, and went for psychological treatment five or six times; she had been placed on antidepressants and had taken them for about two months. Plaintiff testified that, two weeks before her hearing, she had been diagnosed with schizophrenic bipolar disorder at Rediscover Mental Health Center, but they had not given her any medication nor was she taking any at the time of the hearing. She stated she had crying spells that lasted about five minutes approximately once a month. Plaintiff testified that she had been depressed for the entirety of the four years preceding the hearing.

Plaintiff testified to other problems. She stated that she sleeps for about two hours at 5:00 p.m., and would wake up for about five minutes at a time about five times per night; she

6

had done a sleep study and been diagnosed with esophageal reflux. Plaintiff stated that she had problems with memory, forgetting things about three times a month and losing things around the house. She also stated she had difficulty concentrating, not always remembering what she had watched on television; she stated she did not have difficulty reading a few pages out of magazines or remembering what she had read. Plaintiff said she had terrible headaches about twice a week, which lasted the whole day and sometimes made her sick to her stomach; at one point, she had taken medication for these but it did not work.

Plaintiff discussed her daily activities. She stated that she would go grocery shopping but not alone, and has a hard time with swelling and breathing after walking around the store; she has to avoid certain aisles such as those containing cleaning products because they give her breathing problems. She stated that she did not dust or vacuum because of the dust. She testified that, when she was awake from about 12:30 p.m. until about 6:00 at night, she would spend her time caring for her four-year-old daughter, though it was difficult to stand up to cook and, about once a month, it was difficult to grip things because of swelling in her hands.

A vocational expert also testified. She stated that Plaintiff had past relevant work as a line worker/cashier in the food industry. Questioned by the ALJ, the vocational expert stated that a claimant with an RFC as assessed for Plaintiff by the ALJ could perform her past relevant work as a cashier with a sit/stand option. The vocational expert testified that, though the relevant publications do not address a sit/stand option, the vocational expert had personally placed individuals in such jobs and has observed other people in the field working with such an option. Finally, the vocational expert testified that Plaintiff would not be able

7

to perform her past relevant work as a cashier if she were restricted from contact with the public because environmental contaminants such as perfumes exacerbated her asthma.

### C.     The ALJ's Decision

The ALJ discussed the five-step sequential evaluation process for disability claims. He determined that she had the severe impairment of a history of asthma, which placed some limitations on her ability to function in the workplace. However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the requirements of any of the listed impairments found at 20 C.F.R. § 404 Appendix 1, Subpart P, Regulation No. 4.

Proceeding to the next step of the sequential evaluation, the ALJ considered whether Plaintiff could perform her past relevant work, considering her impairment, symptoms, and residual functional capacity. The ALJ noted Plaintiff's testimony, including her allegations concerning shortness of breath, environmental factors (foods, pollen, air fresheners, household cleaners) causing breathing problems, asthma attacks, sleep dysfunction, blurred vision/headaches, and transportation problems.

Listing factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), the ALJ reviewed Plaintiff's subjective complaints. The ALJ noted Plaintiff's poor work record. The ALJ also noted that she continued to smoke. The ALJ also noted that Plaintiff has worked in the past with a similar level of pulmonary function.

The ALJ then found that the record did not support a finding of disabling asthma, noting several chest x-rays within normal limits. The ALJ noted that Plaintiff's medical

8

records showed she had been repeatedly referred for help with tobacco dependency, but continued to smoke. He commented that, despite Plaintiff's complaints about environmental factors, she had given a medical history stating that she had no known allergies which would exacerbate her breathing; the ALJ found it interesting that she gave that history in 2004, three years after her alleged onset date. The ALJ found that the medical and other evidence undercut Plaintiff's credibility on her claim of disabling impairments.

Even "giving [Plaintiff] the great benefit of the doubt as to her pulmonary function," the ALJ concluded that the record was consistent with a residual functional capacity ("RFC") including: ability to lift and carry a maximum of fifty pounds occasionally with twenty-five pounds frequently; ability to stand or walk for one hour at a time for six of eight hours and sit for six of eight hours; need to not work around pulmonary irritants including heat, cold, and humidity (due to pulmonary functioning). Considering the vocational expert's testimony, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

## II.     Discussion

Plaintiff takes issue with the ALJ's decisions regarding her RFC and his finding that she is capable of performing her past relevant work. She argues that the ALJ improperly formed his own opinion about the impact of her impairments on her ability to work, and that he should have further developed the record in this regard. Plaintiff argues that the ALJ's finding that she is capable of past relevant work is, therefore, invalid. Finally, Plaintiff

9

argues that the ALJ did not adequately consider the functional demands of her past relevant work in comparing it to her RFC.

RFC is a "function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004). RFC is the most an individual can do despite the combined effect of all credible limitations. 20 C.F.R. § 416.945. *See also Pearsall*, 274 F.3d at 1217 (clarifying that the claimant has the burden of showing an inability to work).

While the ALJ is ultimately responsible for assessing RFC based on all relevant evidence, the ALJ's RFC assessment must be based on some medical evidence of the claimant's ability to function in the workplace. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); *Social Security Ruling* 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996) ("The RFC assessment must always consider and address medical source opinions." ). ALJs may not substitute their own opinions for those of medical professionals. *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005). Even where claimants are represented by counsel, ALJs have the duty of fully and fairly developing the facts with regard to RFC. *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002).

In *Bowman*, the Eighth Circuit held that an ALJ had failed to properly develop the record with regard to RFC. *Bowman*, 310 F.3d at 1085. There, the treatment notes of the claimant's treating physician were "cursory," and did not comment on the claimant's ability to function in the workplace. *Id.* The ALJ relied on a report of a non-examining state consultant in assessing RFC. *Id. Cf. Cox*, 495 F.3d at 620 n. 6 (affirming a denial of

disability benefits where the record contained medical records discussing the claimant's functional limitations, even though those medical records did not explicitly reference "work"). Despite the consultant's assessment, the *Bowman* court found that the ALJ should have developed the record by obtaining further evidence from the treating physician concerning the claimant's functional limitations. *Bowman*, 310 F.3d at 1085.

Here, the record is devoid of even a consultant's assessment of Plaintiff's limitations. Her treating physicians do not appear to have considered any functional limitations, nor have consultants. However, the record does contain medical evidence that Plaintiff had serious asthma requiring hospitalization, and there are allegations of possible mental health issues and/or fibromyalgia. The ALJ did not discuss any medical evidence relating to Plaintiff's ability to perform the demands of work, and instead substituted his own judgment. In this case, the ALJ was obligated to further develop the record with regard to Plaintiff's functional limitations.

### III.    Conclusion

The ALJ's RFC determination is not supported by substantial evidence. The findings based on that RFC determination are, therefore, invalid.

Accordingly, it is hereby

ORDERED that Plaintiff's petition [Doc. # 4] is GRANTED.

s/ Nanette K. Laughrey

11

Case 4:08-cv-00956-NKL   Document 24   Filed 09/08/09   Page 11 of 12

                                                  NANETTE K. LAUGHREY  
                                                  United States District Judge

Dated: September 8, 2009  
Jefferson City, Missouri